Sheree DEMMING, Appellant–Plaintiff,

v.

Cheryl UNDERWOOD and Kenneth Kinney, Appellees–Defendants.

No. 53A01–1005–PL–252.

Court of Appeals of Indiana.

Feb. 21, 2011.

Rehearing Denied May 2, 2011.

E. Paige Freitag, Jones, McGlasson & Benckart, P.C., Thomas E. Densford, Bauer & Densford, Bloomington, IN, Attorneys for Appellant.

Lonnie D. Johnson, Pamela J. Hensler, Clendening Johnson & Bohrer, P.C., Bloomington, IN, Attorneys for Appellees.

## OPINION

MATHIAS, Judge.

Sheree Demming ("Demming") appeals from the Monroe Circuit Court's entry of summary judgment in favor of Cheryl Underwood ("Underwood") and Kenneth Kinney ("Kinney") (collectively, "the Defen-

dants") on Demming's claims for breach of fiduciary duty and constructive fraud, as well as Demming's request for the imposition of a constructive trust. We reverse and remand for proceedings consistent with this opinion.

### Facts and Procedural History

The facts most favorable to the nonmoving party establish that Demming is a real estate investor in the business of acquiring properties in the Bloomington, Indiana area for remodeling, renovation, leasing, and sale. Demming, who has never held a realtor's license, engaged Underwood's professional services as a realtor to buy and sell properties on multiple occasions between July 2002 and April 2007. During this time, Demming routinely discussed her real estate investment strategy with Underwood, including her plans to acquire multiple properties within a "target zone" near the Indiana University campus. Appellant's App. pp. 135–36.

In 2002, Demming became particularly interested in purchasing two properties located within her target zone at 424 and 426 East Sixth Street ("the Properties"). The Properties were owned by Marion and Frances Morris ("the Morrises"), who lived out of state. Realtor Julie Costley ("Costley") managed the Properties, which were not listed for sale. After discussing Demming's interest in acquiring the Properties, Demming and Underwood agreed that the best strategy would be for Underwood to approach Costley with an offer on behalf of Demming, because as a realtor, Costley would be obligated to relay an offer presented by another realtor to the Morrises.

Underwood first presented an offer to Costley on Demming's behalf in the fall of 2002. After the offer was declined, Demming and Underwood "strategized" together on how Demming could acquire the Properties, and Underwood offered to contact Costley every few months to inquire about the Properties' availability. *Id.* at 146. Over the next few years, up until early 2007, Underwood contacted Costley on Demming's behalf regarding the Properties "every four of five months." *Id.* Additionally, in May, August, and October 2006, Underwood contacted Costley to inquire into the availability of the Properties after Demming specifically instructed her to do so. While Underwood was not compensated for these services, "it was discussed and understood that ... Underwood would be paid a real estate commission, at closing, in the customary amount of seven percent (7%) of the sales price." *Id.* at 234. However, unbeknownst to Demming, Underwood became interested in purchasing the Properties for herself after she acquired a neighboring property in May 2006.

In February 2007, Demming again instructed Underwood to call Costley and inquire into the availability of the Properties for purchase. Underwood responded, "Sheree, she's just not going to sell." *Id.* at 139. Demming nevertheless insisted that Underwood contact Costley, and said that if Underwood refused, she would contact Costley herself. Underwood then agreed to call Costley, and when she did so, she asked Costley to contact Mrs. Morris, whose husband had recently passed away, to find out if she would be interested in selling. Costley responded that she would contact Mrs. Morris, but she expressed doubt as to whether Mrs. Morris would be willing to sell. The next day, Underwood told Demming that the Properties were not for sale. Demming instructed Underwood to "stay on it" because she believed that Mrs. Morris would be willing to sell in the near future. *Id.*

A few days later, Costley contacted Mrs. Morris, who instructed her to request that anyone interested in purchasing the Prop-

erties tender a written offer. When Costley informed Underwood that Mrs. Morris was willing to entertain an offer, Underwood did not relay this information to Demming. Instead, on March 9, 2007, Underwood and Kinney, acting as partners, tendered their own written offer to purchase the Properties. A counteroffer was tendered and accepted, pursuant to which Underwood and Kinney agreed to purchase the Properties for $650,000. Underwood and Kinney closed on the transaction on March 30, 2007.

On April 14, 2007, Demming contacted Underwood after noticing one of Underwood's "For Rent" signs in front of the Properties. Underwood and Demming met the next day, and Underwood informed Demming that she and Kinney had purchased the Properties.

On April 19, 2007, Demming filed suit against Underwood asserting claims for breach of fiduciary duty and constructive fraud. Demming also requested the imposition of a constructive trust compelling Underwood and Kinney to convey title of the Properties to her. Underwood and Kinney moved for summary judgment on October 13, 2009, and Demming filed her response on November 13, 2009. The trial court conducted a hearing on the summary judgment motion on February 5, 2010, and thereafter took the matter under advisement. On May 7, 2010, the trial court issued its order granting summary judgment in favor of Underwood and Kinney on all claims. In so doing, the trial court entered specific findings and conclusions, in which it concluded that there were no genuine issues of material fact and that no agency relationship existed between Demming and Underwood as a matter of law. This appeal ensued. Additional facts will be provided as necessary.

## Standard of Review

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Our standard of review is well settled:

> Our analysis proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use.... When reviewing an entry of summary judgment, we stand in the shoes of the trial court. We do not weigh the evidence but will consider the facts in the light most favorable to the nonmoving party. All doubts as to a factual issue must be resolved in the nonmovant's favor. A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant has the burden of demonstrating that the grant of summary judgment was erroneous. Nevertheless, we must carefully assess the trial court's decision to ensure the nonmovant was not improperly denied his day in court.

*Rogier v. Am. Testing & Eng'g Corp.,* 734 N.E.2d 606, 613 (Ind.Ct.App.2000) (citations omitted).

Here, the trial court made findings and conclusions in support of its entry of summary judgment. While the entry of specific findings and conclusions offers insight into the reasons for the trial court's decision on summary judgment and facilitates appellate review, such findings are not binding on this court. *Ashbaugh v. Horvath,* 859 N.E.2d 1260, 1264–65 (Ind.Ct. App.2007).

### I. Common Law Agency

Demming first argues that the trial court erred in granting summary judgment in favor of the Defendants on her breach of fiduciary duty claim because

a genuine issue of material fact exists as to whether Underwood owed Demming a fiduciary duty under the common law of agency. " 'Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former.' " *Meridian Sec. Ins. Co. v. Hoffman Adjustment Co.*, 933 N.E.2d 7, 12 (Ind.Ct.App.2010) (quoting *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind.Ct.App.2002)), *trans. denied.* To establish an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent. *Douglas v. Monroe*, 743 N.E.2d 1181, 1186 (Ind.Ct.App.2001). These elements may be proven by circumstantial evidence, and there is no requirement that the agent's authority to act be in writing. *Dep't of Treasury v. Ice Serv., Inc.*, 220 Ind. 64, 67–68, 41 N.E.2d 201, 203 (1942). Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate. *Douglas*, 743 N.E.2d at 1187.

■ Here, the trial court concluded that no common law agency relationship existed between Demming and Underwood as a matter of law, in part because Underwood never agreed to act as Demming's agent.[1] Similarly, the Defendants claim that no agency relationship was established because Underwood simply "made a few telephone inquiries" regarding the Properties

"as an act of customer service and not as an acceptance of any agency."[2] Appellee's Br. at 12. Demming, however, argues that the evidence establishing that Underwood made multiple inquiries into the availability of the Properties on her behalf over a period of more than four years supports an inference that Underwood agreed to act as her agent and creates a genuine issue of material fact precluding entry of summary judgment. We agree.

After first becoming interested in purchasing the Properties in 2002, Demming asked Underwood to approach Costley with an offer to purchase, and Underwood complied. After that offer was rejected, Demming and Underwood devised a plan for Demming to acquire the Properties. In accordance with this plan, Underwood approached Costley every few months to inquire into the Properties' availability for purchase. In May, August, and October 2006, and again in February 2007, Underwood contacted Costley to inquire into the availability of the Properties after Demming specifically instructed her to do so. This evidence, when taken together, supports an inference that Underwood agreed to act as Demming's agent for the purpose of acquiring the Properties.

■ The trial court also concluded that no agency relationship was established between Demming and Underwood because Demming did not exert sufficient control over Underwood regarding "the method or terms on which inquiries were made re-

1. The trial court made no findings regarding whether Demming manifested her consent for Underwood to act as her agent, and neither party addresses this issue on appeal. We therefore limit our analysis to the second and third elements necessary to establish an actual agency relationship.

2. Underwood also points out that she was not compensated for her services with regard to the Properties. However, an agent may act gratuitously on behalf of a principal, and a gratuitous agent owes the same fiduciary duties as an agent who receives compensation for his or her services. *Gilbert v. Loogootee Realty, LLC*, 928 N.E.2d 625, 630 (Ind.Ct.App. 2010), *trans. denied.* We nevertheless note that the evidence most favorable to the nonmovant establishes that Underwood was to be paid the standard real estate commission of seven percent of the purchase price at closing.

garding [the Properties]." Appellant's App. p. 15. The trial court found that

> [n]o discussion, authority, or direction was had or given between Demming and Underwood regarding purchasing authority, purchase price or other terms, or authority to negotiate, regarding the [Properties].[3]

*Id.* The Defendants agree, relying on a case from the Indiana Tax Court for the proposition that "[t]he principal's control cannot simply consist of the right to dictate the accomplishment of a desired result." *Policy Mgmt. Sys. Corp. v. Ind. Dep't of State Revenue,* 720 N.E.2d 20, 24 (Ind. Tax Ct.1999), *trans. denied.* Thus, according to the Defendants, no agency relationship could have been established because Demming did not specify the precise manner in which Underwood was to make inquiries regarding the Properties.

■ To satisfy the control element, "[i]t is necessary that the agent be subject to the control of the principal with respect to the details of the work." *Turner v. Bd. of Aviation Comm'rs,* 743 N.E.2d 1153, 1163 (Ind.Ct.App.2001), *trans. denied.* However, the principal need not exercise complete control over every aspect of the agent's activities within the scope of the agency. *Policy Mgmt. Sys.,* 720 N.E.2d at 24. Thus, in this case, we do not believe it was necessary for Demming to specify the precise method by which Underwood was to contact Costley; rather, it was enough that Demming instructed Underwood to make contact with Costley. But in any event, contrary to the Defendants' assertions, the evidence most favorable to the

non-moving party establishes that Demming specified that Underwood should contact Costley by phone, and Underwood complied. Appellant's App. pp. 139, 146. Moreover, Demming did more than just dictate the desired result of the agency, i.e. Demming's purchase of the Properties. She also dictated the strategy by which Underwood was to accomplish this result, namely, by continually contacting Costley, who would in turn contact the owners.

While it is true that Demming did not give Underwood the authority to negotiate the purchase of the Properties without further consultation, this fact does not establish a lack of control on Demming's part. Indeed, when this evidence is properly construed in favor of Demming in accordance with our standard of review, it gives rise to the inverse inference that Demming had the right to exercise extensive control over the details of Underwood's performance, including when and how to make an offer to purchase. We therefore conclude that the designated evidentiary materials create a genuine issue of material fact regarding whether Demming exercised sufficient control over Underwood's activities to support the existence of an agency relationship.

■ Because the trial court concluded that no agency relationship existed between Demming and Underwood as a matter of law, it did not reach the issue of breach. On appeal, however, the Defendants argue that even if there is a genuine issue of material fact as to whether a common law agency relationship existed,

---

3. The trial court also noted that Demming's expert, Tim Reed ("Reed"), a former Chair of the Indiana Real Estate Commission, opined that had Demming learned that the Properties were for sale, she would have been free to purchase them through another real estate agent. However, Reed also opined that an agency relationship existed between Dem-

ming and Underwood and that if Demming had used another real estate agent to purchase the Properties, Underwood "would have had the right through professional standards to arbitrate the commission with the agent that Ms. Demming chose because she was originally working with Ms. Underwood." Appellant's App. p. 194.

Underwood did not breach her fiduciary duty to Demming because at the time of the alleged breach, the purposes of the agency had already been satisfied. Specifically, the Defendants assert that the scope of the alleged agency was limited to the services to which Demming consented, which they claim consisted only of Underwood making isolated inquiries into whether the Properties were available, and that the agency was fulfilled once Underwood accurately reported that the Properties were not for sale.[4] We disagree.

■ First, Demming argues that the evidence most favorable to her supports an inference that Underwood reported inaccurate or misleading information to Demming regarding the availability of the Properties.[5] Demming testified in her deposition that she told Underwood to contact Costley in February 2007, and that Underwood told her the next day that the Properties were not for sale. However, Costley testified in her deposition that when she spoke to Underwood in February, she expressed doubt as to whether Mrs. Morris would be willing to sell, but nevertheless agreed to contact Mrs. Mor-

ris to inquire. It was not until a few days later that Costley spoke to Mrs. Morris and learned that she was willing to entertain offers.

Thus, the evidence supports an inference that Underwood told Demming that the Properties were not for sale before receiving an answer from Costley. While Underwood may have sincerely believed at that time that Mrs. Morris would not sell the Properties, her representation to Demming was incomplete, and therefore misleading. Accordingly, even assuming that the agency relationship was limited to Underwood making a single inquiry regarding the Properties and reporting what she learned to Demming, a genuine issue of material fact exists as to whether Underwood breached the fiduciary duty arising from that agency relationship. *See Medtech Corp. v. Ind. Ins. Co.*, 555 N.E.2d 844, 850 (Ind.Ct.App.1990) (an agent has a duty to act in good faith and with due care), *trans. denied; Egan v. Burkhart*, 657 N.E.2d 401, 404 (Ind.Ct.App.1995) (an agent has a duty to disclose to the principal all facts within her knowledge which she may learn within the course of the

---

4. Relying on Restatement (Third) of Agency § 8.09, which provides that an agent has a duty to take action only within the scope of his or her actual authority, the Defendants also appear to argue that there could be no breach because Demming had given Underwood no authority to negotiate a purchase price for the Properties. But the fact that Underwood did not breach her fiduciary duties by exceeding the bounds of her authority does not preclude a conclusion that Underwood breached other fiduciary duties owed. *See, e.g.*, Restatement (Third) of Agency § 8.02 ("An agent has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position."); Id § 8.03 ("An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship."); *Id.* § 8.04

("Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal...").

5. The Defendants argue that Demming impermissibly makes this argument for the first time on appeal. However, in her response to the Defendants' motion for summary judgment, Demming alleged that Underwood either deliberately lied or intentionally failed to inform Demming about the availability of the Properties in order to prevent Demming from purchasing them. Appellant's App. pp. 258, 259. Likewise, Demming argued at the summary judgment hearing that it was unclear whether Underwood had lied to Demming when she told her that the Properties were not for sale. Tr. p. 18. We therefore conclude that Demming has properly preserved this argument for appeal.

agency that are material to the purposes of the agency or which might influence the principal's actions in relation thereto).

Even if Underwood reported accurate information to Demming, the Defendants construe the scope of the alleged agency too narrowly. It is clear that the reason Demming repeatedly instructed Underwood to contact Costley regarding the Properties' availability over a period of more than four years is that Demming desired to *purchase* the Properties. Indeed, the evidence most favorable to the non-movant establishes that after Demming's first offer to purchase was rejected, Underwood and Demming "strategized" together and determined that the best way for Demming to acquire the Properties was for Underwood to approach Costley every few months on Demming's behalf. Appellant's App. p. 146. On several occasions, including in February 2007, Underwood contacted Costley at Demming's express direction. And after Underwood reported to Demming that the Properties were still not for sale in February 2007, Demming instructed Underwood to "stay on it" because she believed that Mrs. Morris would be willing to sell in the near future. *Id.* at 139. Indeed, the evidence establishes that the parties contemplated Demming's future purchase of the Properties and Underwood's receipt of a standard seven percent commission for her services.

These facts, when taken together, support an inference that Underwood was Demming's agent not only for the purposes of making a few, isolated contacts with Costley regarding the Properties, but for the broader purpose of actually acquiring the Properties.[6] The undisputed fact that Underwood had no authority to enter into negotiations to purchase the Properties on Demming's behalf does not alter this conclusion. When construed in the light most favorable to Demming as the non-movant, this evidence merely establishes that Underwood was without authority to unilaterally tender an offer to purchase without first consulting with Demming. Such a limitation on a real estate agent's authority is not unusual. Other evidence, particularly Demming's deposition testimony that Underwood was to be paid a standard realtor's commission at closing, supports an inference that Demming intended to use Underwood's services to purchase the Properties once they became available. And Underwood's continued assistance to Demming, without compensation, over the course of Demming's four-year pursuit of the Properties supports an inference that Underwood anticipated representing Demming in an eventual sale and receiving a commission for doing so.

Thus, when we consider the evidence in the light most favorable to Demming, we conclude that Underwood was acting as Demming's agent for the purpose of purchasing the Properties. Underwood clearly would have breached the fiduciary duties arising out of that relationship by purchasing the Properties for herself without informing Demming that Mrs. Morris was entertaining offers. *See Bopp v. Brames,* 713 N.E.2d 866, 871 (Ind.Ct.App. 1999) (unless otherwise agreed, an agent is subject to a duty to act solely for the principal's benefit), *trans. denied; Prudential Ins. Co. of America v. Baker,* 499 N.E.2d 1152, 1153 (Ind.Ct.App.1986) (an agent has a duty to refrain from interfer-

---

**6.** This is not to suggest that the agency relationship between Demming and Underwood would continue indefinitely until Demming acquired the Properties. *See, e.g.* Restatement (Third) of Agency § 3.09 cmt. d ("If the parties do not specify a duration for the agent's actual authority, it terminates after a reasonable period of time.").

ing with the principal's ability to accomplish the purpose of the agency), *trans. denied; Potts v. Review Bd. of Ind. Emp't Sec. Div.*, 475 N.E.2d 708, 711 (Ind.Ct.App. 1985) (an agent has a duty not to place himself in a position where his own interests are potentially antagonistic to those of his principal), *trans. denied.*

Construing the evidence in the light most favorable to Demming, as we must, we conclude that a genuine issue of material fact exists as to whether Underwood breached a common law fiduciary duty owed to Demming. Therefore, the trial court erred in granting summary judgment in favor of the Defendants on Demming's claim for breach of fiduciary duty arising out of a common law agency relationship.

## II. Statutory Agency

The trial court also granted Underwood's motion for summary judgment on the issue of whether Underwood breached a fiduciary duty owed to Demming under Indiana's real estate agency statutes. The interpretation of a statute is a pure question of law and is reviewed under a *de novo* standard. *Herron v. State*, 729 N.E.2d 1008, 1010 (Ind.Ct.App. 2000), *trans. denied.* In statutory construction, our primary goal is to ascertain and give effect to the intent of the legislature. *Gray v. D & G, Inc.*, 938 N.E.2d 256, 259 (Ind.Ct.App.2010). The language of the statute itself is the best evidence of legislative intent, and we must give all words their plain and ordinary meaning unless otherwise indicated by statute. *Id.*

Moreover, statutes in derogation of common law will be strictly construed, particularly when the statute affects a common-law right or duty. *Bartrom v. Adjustment Bureau, Inc.*, 618 N.E.2d 1, 10 (Ind.1993). We presume that when the legislature enacts a statute, it is aware of the common law

and does not intend to make any change in it beyond what it declares either in express terms or by unmistakable implication. *Id.* Thus, in cases of doubt, we will construe a statute as not changing the common law. *Id.*

Here, the trial court concluded as a matter of law that no statutory agency relationship was formed between Demming and Underwood because Demming was not Underwood's client for the purposes of our real estate licensing statutes. We initially observe that the applicable statutes are nearly opaque. To complicate matters further, there is a dearth of case law interpreting them. Indeed, our research has discovered only two cases citing the relevant portions of the Indiana Code, and neither directly addresses the issues presented here. *See Nichols v. Minnick*, 885 N.E.2d 1, 3 (Ind.2008); *Likens v. Prickett's Properties, Inc.*, 943 N.E.2d 816 (Ind. Ct.App.2011). We are therefore left to decipher the statutes without the aid of previous interpretations.

Turning to the task before us, we first note that the pertinent Indiana Code chapter is entitled Real Estate Agency Relationships ("the Agency Chapter"). Ind.Code ch. 25–34.1–10. Section 9.5(a) (2010) of the Agency Chapter provides that a real estate licensee has an agency relationship with the individual with whom the licensee is working, unless: "(1) there is a written agreement to the contrary; or (2) the licensee is merely assisting the individual as a customer without compensation." Neither party contends that Demming and Underwood had entered into any sort of written agreement. Thus, in order to determine that Underwood was not Demming's agent, we must conclude that Underwood was assisting Demming as a customer without compensation.

The definition of "customer" within the Agency Chapter provides us with little guidance. "Customer" is defined in the negative, as "a person who is provided services in the ordinary course of business by a licensee but who is not a client." Ind.Code § 25–34.1–10–6 (2010). Thus, to classify Demming as a customer, we must exclude her as Underwood's client. A "client" is defined as "a person who has entered into an agency relationship with a licensee." Ind.Code § 25–34.1–10–5 (2010).

These definitions highlight the perplexities inherent in the Agency Chapter. Section 25–34.1–10–9.5(a)(2) provides that a real estate licensee has an agency relationship with and is representing the person with whom the licensee is working unless the licensee is assisting that person as a customer without compensation. But a customer is someone who is not a client, and client is defined as someone who has entered into an agency relationship with a licensee. Thus, under section 25–34.1–10–9.5(a)(2), a person with whom a licensee is working is a client unless he or she is not a client and is not paying for the licensee's services.

Adding another layer of difficulty is Indiana Code section 25–34.1–10–0.5 (2010), which separately defines "agency relationship" as "a relationship in which a licensee represents a client in a real estate transaction." "Real estate transaction" is defined as "the sale or lease of any legal or equitable interest in real estate." Ind. Code § 25–34.1–10–8 (2010).

In concluding that Demming was merely a customer, the trial court rested on the statutory definition of real estate transaction set forth in section 25–34.1–10–8. Specifically, the trial court found that "a 'cold call' to inquire whether certain real estate, not otherwise on the market, could be purchased is not 'the sale or lease any

legal or equitable interest in real estate'; therefore, there was no 'real estate transaction.'" Appellant's App. p. 15. Likewise, the Defendants argue that Demming could not be Underwood's client because the Properties were not for sale when Underwood contacted Costley and, in their view, this precludes a conclusion that Underwood was representing Demming in a real estate transaction. Demming, however, argues that this conclusion constitutes an unduly restrictive interpretation of the statutory definitions of real estate transaction and agency relationship. We agree.

In order to dispose of the issues before us on review of a granted motion for summary judgment, we need not fully explore the interplay between the presumption in favor of the existence of an agency relationship set forth in section 25–34.1–10–9.5 and the definition of agency relationship set forth in section 25–34.1–10–0.5, along with its requirement that the purported agent be representing the client in a real estate transaction. It is enough for us to note that the statutory definition of real estate transaction contains no requirement that the real estate at issue be listed for sale, and it is not our prerogative to engraft such a requirement into the statute. Thus, the fact that the Properties were not listed for sale at the time Underwood contacted Costley does not necessarily preclude a conclusion that Underwood was Demming's agent under the Agency Chapter.

Furthermore, we disagree with the trial court's characterization of Demming and Underwood's relationship as one in which Underwood merely made "a 'cold call'" to determine whether the Properties were available. Our evidence most favorable to Demming as the non-movant establishes that the two strategized together and formulated a plan for Demming to acquire the Properties. Pursuant to this plan, Un-

derwood made multiple contacts with Costley to determine whether the Properties were available over a period of more than four years, all in furtherance of Demming's stated desire to purchase the Properties.

This evidence easily supports an inference that Underwood was actively representing Demming in the pursuit of a real estate transaction that had not yet come to fruition. We conclude that this showing is sufficient to establish a genuine issue of material fact as to whether Underwood was representing Demming in a real estate transaction for the purposes of sections 25–34.1–10–0.5 and –8.[7] To hold that no real estate transaction occurs and that, consequently, no agency relationship is established until a sale or lease of real estate is actually consummated would be to completely sever the statutory real estate agency relationship from its common law roots, a step we will not take in the absence of a clear contrary pronouncement from the legislature.

The Defendants also make much of the fact that Underwood received no compensation from Demming for her repeated contacts with Costley. According to the Defendants, no agency can be formed under the Agency Chapter where a licensee merely performs gratuitous services. However, the plain language of the statute does not support this assertion. Although section 25–34.1–10–9.5(a)(2) provides that a real estate licensee has an agency relationship with the person with whom the licensee is working unless the licensee is assisting that person as a customer without compensation, there is no requirement that an individual compensate a licensee for his or her services in order to qualify as a client. *See* I.C. § 25–34.1–10–5. And in any event, review of the facts most favorable to Demming as the non-movant establishes that Underwood was to be paid in the customary manner for realtors; that is, she would receive a commission of seven percent of the purchase price at closing. Thus, Underwood's own action in purchasing the Properties for herself prevented her from being compensated. For all of these reasons, we conclude that the trial court erred when it concluded as a matter of law that no statutory agency relationship existed between Demming and Underwood.

Because the trial court concluded that no statutory agency relationship was established as a matter of law, it did not reach the issue of breach. But the Defendants also argue that even if a statutory agency relationship was established, Underwood did not breach any duties owed because the relationship had terminated prior to Underwood's purchase of the Properties. In support of this assertion, the Defendants cite section 14 of the Agency Chapter, which provides that if the purposes of a real estate agency relationship are not fulfilled, "the agency relationship ends at the earlier of: (1) a date of expiration agreed upon by the parties; or (2) a termination of the relationship by the parties." Indiana Code § 25–34.1–10–14 (2010). However, the Defendants make no attempt to actually apply the statute. Rather, they simply argue that "the statute embraces the notion that an agency relationship is not perennial—it ends when the duties have been fulfilled or when the

---

7. The Defendants also argue that there was no real estate transaction because Underwood had no authority to negotiate a purchase on Demming's behalf. The statutory basis for this argument is unclear. The definition of real estate transaction makes no reference to any minimum level of authority a licensee must possess, nor does it preclude a client from limiting a licensee's authority to enter into negotiations for or consummate a proposed real estate transaction without further consultation. *See* I.C. § 25–34.1–10–8.

relationship between the parties otherwise ceases." Appellee's Br. at 19.

While we agree that statutory real estate agency relationships are not perennial, we cannot agree that the evidence most favorable to the non-movant in the case before us establishes as a matter of law that Demming and Underwood's relationship terminated prior to Underwood's purchase of the Properties. Neither party alleges that they agreed to an expiration date for their relationship; nor do they claim that they took any action or expressed any desire to terminate the relationship prior to its fulfillment. Thus, the Defendants appear to argue that any statutory agency relationship had been fulfilled at the time Underwood purchased the Properties.

We addressed this argument in our discussion of Demming's common law agency claim and need not dwell on it here. It is sufficient for us to note that the designated evidence supports an inference that Underwood was acting as Demming's agent not only for the purpose of making a few, isolated contacts with Costley in order to determine whether the Properties were for sale, but for the broader purpose of actually acquiring the Properties. The fact that Underwood had no authority to enter into purchase negotiations on Demming's behalf without first consulting with Demming does not alter this conclusion.

■ The Defendants also argue that under section 11(e) of the Agency Chapter, Indiana Code section 25–34.1–10–11(e) (2010), the undisputed facts establish as a matter of law that Underwood did not breach any duty owing to Demming. This section provides, in pertinent part, that a real estate licensee representing a buyer or tenant may "show properties in which the buyer or tenant is interested to other prospective buyers or tenants and may show competing buyers or tenants the same property or assist other buyers or tenants in purchasing or leasing a particular property without breaching any duty or obligation to the buyer or tenant[.]" *Id.* The Defendants admit that this statute is silent as to whether a real estate licensee may personally purchase a property in which her client is interested, but nevertheless argue that because the plain meaning of the statute does not prohibit the practice, it must necessarily permit it. We strongly disagree.

Under our common law of agency, it is axiomatic that an agent has a duty to act solely for the principal's benefit and may not place herself in a position where her own interests are potentially antagonistic to those of the principal. *See Potts v. Review Bd. of Ind. Emp't Sec. Div.*, 475 N.E.2d 708, 712 (Ind.Ct.App.1985), *trans. denied.* In enacting section 25–34.1–10–11(e), the legislature made no clear declaration or unmistakable implication that it intended to abandon this fundamental principle and allow real estate licensees representing buyers to purchase properties "out from under" their clients. Rather, the statute takes the smaller step of allowing real estate licensees to represent multiple buyers who are interested in the same parcel. And there is a good reason for this distinction; a licensee representing multiple buyers presumably has no personal stake in which buyer ultimately purchases the parcel, and therefore has no incentive to treat any of them unfairly. But if the licensee herself wishes to purchase the parcel, this desire introduces an element of competition between the licensee and client, and such a conflict of interest may lead to abuses by the licensee. We therefore conclude that Indiana Code section 25–34.1–10–11(e) does not allow a licensee representing a buyer to purchase properties during the course of the agency with respect to which he or she has acted

as the buyer's agent and in which the client has expressed interest.[8]

For all of these reasons, we conclude that the trial court erred in granting summary judgment in favor of the Defendants on Demming's claim for breach of fiduciary duties arising out of Indiana's real estate agency statutes.

### III. Constructive Fraud & Constructive Trust

■■■■ Next, Demming argues that the trial court erred in granting summary judgment in favor of the Defendants on her constructive fraud claim. " 'Constructive fraud arises by operation of law from a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud.' " *Kreighbaum v. First Nat. Bank & Trust,* 776 N.E.2d 413, 420 (Ind.Ct.App.2002) (quoting *Marathon Oil Co. v. Collins,* 744 N.E.2d 474, 480 (Ind.Ct.App.2001)). The five elements of constructive fraud are:

> (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advan-

tage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind.1996); *see also Kreighbaum,* 776 N.E.2d at 421. A plaintiff alleging the existence of constructive fraud has the burden of proving the first and last of these elements. *Strong v. Jackson,* 777 N.E.2d 1141, 1147 (Ind.Ct.App.2002), *aff'd on reh'g,* 781 N.E.2d 770 (Ind.Ct.App. 2003), *trans. denied.* The duty mentioned in the first element may arise by virtue of the existence of a fiduciary relationship. *Id.* Once the plaintiff meets the burden of proof with respect to these two elements and establishes the existence of a fiduciary relationship, the burden shifts to the defendant to disprove at least one of the remaining three elements by clear and unequivocal proof. *Id.*

■■■■ Here, the trial court concluded that no constructive fraud had occurred as a matter of law because no agency relationship existed between Demming and Underwood, and as a result, Underwood owed no duty to Demming.[9] However, as set forth above, a genuine issue of material fact exists as to whether Underwood was Demming's agent for the purposes of acquiring the Properties at the time that she purchased the Properties for herself. Thus, the trial court erred in concluding that Demming's constructive fraud claim failed as a matter of law because Underwood owed her no fiduciary duty.

---

8. Finally, the Defendants point out that Indiana Code section 25–34.1–10–15 (2010) provides that "[t]he duties and obligations of a licensee set forth in this chapter supersede any fiduciary duties of a licensee to a party based on common law principles of agency to the extent that those common law fiduciary duties are inconsistent with the duties and obligations set forth in this chapter." However, because neither of the parties identified any conflicts between the duties owed by a real estate agent to a client under the common law and our real estate agency statutes, this provision does not alter our common law or statutory analysis.

9. Constructive fraud may arise in the absence of a fiduciary relationship, such as in the case of a buyer and seller. *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind.Ct.App.1994), *trans. denied.* However, because the only basis for constructive fraud asserted here is the alleged fiduciary relationship between Demming and Underwood, we limit our analysis accordingly.

However, the Defendants assert that Demming's constructive fraud claim must fail as a matter of law for the additional reason that Demming cannot establish a genuine issue of material fact as to the fifth element of constructive fraud. The Defendants do not dispute that Underwood gained an advantage at Demming's expense when she learned that Mrs. Morris was willing to sell the Properties and, instead of relaying that information to Demming, purchased the Properties for herself. However, the Defendants insist that in order to satisfy the fifth element of constructive fraud, a transaction of some sort must occur *between the dominant and subordinate parties* to a fiduciary relationship. Thus, in the Defendants' view, no constructive fraud could have occurred in this instance because no real estate transaction took place between Demming and Underwood.

◼ The Defendants quote *Strong* for the proposition that constructive fraud may only be predicated on a "transaction between the two (2) parties" resulting in an unfair advantage to the dominant party. 777 N.E.2d at 1146 (quoting *In re Estate of Wade,* 768 N.E.2d 957, 961–62 (Ind.Ct. App.2002), *trans. denied* ). But the Defendants have taken this quote out of context. In *Strong,* the court noted that two lines of cases regarding constructive fraud had developed in Indiana. *Id.* The first line simply listed the five elements of constructive fraud as set forth in *Rice. Id.* The second line of cases, including *Lucas v. Frazee,* 471 N.E.2d 1163 (Ind.Ct.App.1984), which we discuss in greater detail below, held as follows:

> Where the relationship is one of principal and agent, if the plaintiff's evidence establishes (a) the existence of a fiduciary relationship, and (b) the questioned transaction between the two (2) parties resulted in an advantage to the domi-

> nant party in whom the subordinate party had reposed both their trust and confidence, the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void. Once these facts are established, the burden shifts to the dominant party in the relationship to rebut the presumption by clear and unequivocal proof.

*Strong,* 777 N.E.2d at 1146 (citations and internal quotations omitted) (quoting *Wade,* 768 N.E.2d at 961–62). It is from this portion of the *Strong* opinion that the Defendants quote. But the Defendants fail to note that the *Strong* court went on to harmonize the two lines of cases by holding that where constructive fraud is alleged within the context of a fiduciary relationship, the plaintiff has the initial burden of proving the first and last elements enumerated in *Rice,* and that once a plaintiff satisfies this burden, the burden shifts to the defendant to disprove at least one of the remaining three elements by clear and unequivocal proof. *Id.* at 1147. Thus, this court's holding in *Strong* contained no requirement that a transaction take place between the dominant and subordinate parties to a fiduciary relationship in order to support a claim for constructive fraud.

The Defendants also cite *Lucas* in support of their argument that a claim of constructive fraud must be premised upon a transaction between the dominant and subordinate parties in a fiduciary relationship. In *Lucas,* this court noted that various legal and domestic relationships, including that of principal and agent, give rise to a presumption of trust and confidence as to the subordinate party and a corresponding influence as to the dominant party. 471 N.E.2d at 1166. If a plaintiff establishes the existence of such a relation-

ship and that a transaction between the parties to that relationship resulted in an advantage to the dominant party, "the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void."[10] *Id.* at 1167. Once this presumption is triggered, the burden shifts to the dominant party to establish by clear and unequivocal proof that the questioned transaction was conducted at arm's length, and therefore valid. *Id.*

■ The Defendants' reliance on *Lucas* is misplaced. As an initial matter, we note that this court's holding in *Strong* casts doubt on *Lucas*'s continuing validity with respect to constructive fraud claims. And to the extent that *Lucas* remains good law, it stands for two uncontroversial propositions: (1) transactions taking place between parties to specific types of confidential relationships, including that of principal and agent,[11] and resulting in an advantage to the dominant party trigger a presumption of undue influence, and (2) transactions procured through the exertion of undue influence are constructively fraudulent. 471 N.E.2d at 1167–68. However, no showing of undue influence is required to support a constructive fraud claim. *Morfin v. Estate of Martinez*, 831 N.E.2d 791, 803 (Ind.Ct.App.2005). Indeed, constructive fraud may be based upon a number of theories, including mis-

take, duress, or breach of fiduciary duty. *Hardy v. South Bend Sash & Door Co.,* 603 N.E.2d 895, 901 (Ind.Ct.App.1992), *trans. denied; Blaising v. Mills,* 176 Ind. App. 141, 146, 374 N.E.2d 1166, 1169 (Ind. Ct.App.1978).

■ As we explained above, a genuine issue of material fact exists as to whether Underwood breached a fiduciary duty owed to Demming. And " '[w]here a relationship of trust and confidence exists between parties, equity will act to protect it and to prevent the party owing the duty from profiting by its breach.' " *Kreighbaum,* 776 N.E.2d at 419 (alteration in original) (quoting *Peoples Trust Bank v. Braun,* 443 N.E.2d 875, 879 (Ind.Ct.App. 1983)). Keeping in mind the equitable principles underlying the doctrine of constructive fraud, we reject the Defendants' contention that an action for constructive fraud cannot be maintained in the absence of a transaction between the parties to a confidential or fiduciary relationship. Rather, we hold that where an agent has acquired an advantage from a third party at the principal's expense as a result of actions taken in furtherance of the underlying agency between the principal and agent, the principal has satisfied his or her burden with respect to a constructive fraud claim as set forth in *Strong.*

■ Demming's designated evidence establishes a genuine issue of material fact

10. The Defendants also cite *Lucas* for the proposition that the subordinate party "not only carries the burden of establishing the existence of some relationship between the parties, but also carries the additional burden of proving the parties to the questioned transaction did not deal on terms of equality." 471 N.E.2d at 1167. But here again, the Defendants have taken a quote of context. In *Lucas,* the court held that the subordinate party bears this additional burden only when the alleged confidential relationship between the parties is other than that of attorney and

client, parent and child, principal and agent, or the like. *Id.*

11. Other relationships falling within this category include attorney and client, guardian and ward, pastor and parishioner, and parent and child. *Lucas,* 471 N.E.2d at 1166–67. Although *Lucas* included the relationship of husband and wife in this category, Indiana law no longer recognizes a presumption of undue influence in transactions between spouses. *Womack v. Womack,* 622 N.E.2d 481, 483 (Ind.1993).

as to whether Underwood was Demming's agent for the purpose of acquiring the Properties. Demming's evidence also creates a genuine issue of material fact as to whether Underwood obtained an advantage from a third party, i.e. the opportunity to purchase the Properties from Mrs. Morris, as a result of actions taken in furtherance of the purposes of that agency relationship, i.e. Underwood's phone calls to Costley. The burden therefore shifts to the Defendants to disprove one of the remaining elements of constructive fraud by clear and unequivocal proof. Because the Defendants have made no attempt to do so, either in their motion for summary judgment or on appeal, we conclude that summary judgment was inappropriate on Demming's constructive fraud claim.

■■■ With regard to Demming's request for the imposition of a constructive trust, we note that a constructive trust may be imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he or she would be unjustly enriched if permitted to retain it. *Morfin*, 831 N.E.2d at 801. An equitable duty to convey the property may arise if the property was acquired through a breach of fiduciary duty or constructive fraud. *Id.* at 801–02; *Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 912 (Ind.Ct.App.1999). As we have concluded that genuine issues of material fact preclude summary judgment on Demming's breach of fiduciary duty and constructive fraud claims, we must likewise conclude that summary judgment was an inappropriate vehicle for the trial court to dispose of Demming's request for the imposition of a constructive trust.

## IV. Vicarious Liability

■■■ Finally, the Defendants argue that even if we reverse with respect to Demming's claims for breach of fiduciary duty and constructive fraud, summary judgment should be affirmed with respect to Kinney because he is not vicariously liable for Underwood's actions. The doctrine of vicarious liability as it applies to general partnerships is an effect of the rule that each partner is the agent of the others. *Monon Corp. v. Townsend, Yosha, Cline & Price*, 678 N.E.2d 807, 810 (Ind. Ct.App.1997), *trans. denied.* Under the doctrine, a partnership is liable for the actions of any one of its members in conducting the partnership business. *Id;* see *also* Ind.Code § 23–4–1–13 (2005) (partnership is liable for wrongful acts or omissions of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners); Ind.Code § 23–4–1–15 (2005) (partners are jointly and severally liable for everything chargeable to the partnership under Indiana Code section 23–4–1–13).

■■■ Here, the Defendants argue that although Kinney and Underwood are now partners in a business to own and lease the Properties, Kinney is not vicariously liable for Underwood's alleged breach of fiduciary duty and constructive fraud because the partnership had not yet been formed at the time that Underwood first made an offer to purchase the Properties. However, Underwood testified in her deposition that the partnership existed at the time she tendered the first offer to purchase on March 9, 2007. Specifically, Underwood testified as follows:

Q: The purchase agreement is dated March 9th, 2007. Is that correct?

A: Uh-huh.

Q: And this is an offer that you tendered to Julie Costley at F.C. Tucker?

A: Correct.

Q: And this would have been tendered after you were told by Julie Costley that the properties were available?

A: Yes.

    \*     \*     \*

Q: The purchase price is four hundred thousand dollars ($400,000)?

A: Yes.

Q: How was that figure arrived at?

A: Just something we decided to try.

Q: Who's we?

A: Mr. Kinney and myself.

Q: So by the time this offer is tendered Mr. Kinney is involved in the transaction?

A: Yes.

Q: In what capacity?

A: As partner.

Tr. p. 105.

The Defendants' argument that the partnership had not yet been formed when Underwood first made an offer to purchase the Properties is simply an invitation for this court to consider the evidence and inferences least favorable to Demming, which we will not do. Demming's designated evidence is also sufficient to create a genuine issue of material fact as to whether the partnership between Underwood and Kinney had been formed at the time of Underwood's alleged breach. Consequently, Kinney is not entitled to summary judgment in his favor on the basis that he is not vicariously liable for Underwood's actions.

For all of these reasons, the trial court erred when it entered summary judgment in favor of the Defendants. We therefore reverse and remand for proceedings consistent with this opinion.

Reversed and remanded for proceedings consistent with this opinion.

FRIEDLANDER, J., and MAY, J., concur.